### In re STUCCO LITIGATION.

### No. 5:96–CV–287–BR(2).

United States District Court,
E.D. North Carolina.

Aug. 12, 1997.

Charles F. Blanchard, Raleigh, NC, for plaintiffs.

Jerry S. Alvis, Robert E. Fields, III, William A. Copenhaver, Womble, Carlyle, Sandridge & Rice, Raleigh, NC, for Dryvit Systems, Inc., STO Corp., Shield Industries, Inc., Parex, Inc., Finestone Corp., Anthony Industries, Inc., Senergy, Inc., and Thoro System Products.

Donald E. Britt, Jr., Wilmington, NC, for Thomas Waterproof Coatings Co.

Stuart Lee Egerton, Patterson, Dilthey, Clay & Bryson, L.L.P., Wilmington, NC, for Continental Stucco Products.

James B. Pressly, Haynsworth, Marion, McKay & Guerard, Eric K. Englebardt, Greenville, SC, for U.S. Gypsum Co.

William A. Copenhaver, Raleigh, NC, for Senergy, Inc., U.S. Gypsum Co., European Stucco Products, Inc., EIFS Industry Members Assn., HSC/Performance Products, a Delaware corporation, and Pleko Southeast Corp.

## ORDER

BRITT, District Judge.

This case is before the court on plaintiffs' motion for class certification. Over 190 pages of briefing have been filed on this issue (not including exhibits) and a class certification hearing has been held. The matter is ripe for review.

### I. *Background*

Plaintiffs' first amended and consolidated complaint seeks to bring a class action on behalf of "[a]ll persons who have an ownership interest in a home or other residential structure which contains an Exterior Insulation and Finish System ["EIFS"] manufactured and/or distributed by any of the Named Defendants and installed during the January 1, 1986 through December 31, 1995 Class Period." (First Am. & Consolidated Class Action Compl. ("Am.Compl.") ¶ 61.) Plaintiffs' complaint, which names sixteen defendants, describes the nature of the case as follows:

> For over 10 years, Defendants have knowingly manufactured, distributed, furnished and falsely advertised defectively designed EIFS to builders and property owners throughout the United States. As detailed below, Defendants failed to adequately design EIFS before distributing it to the general public, and failed to remove EIFS from the market or take other remedial action while knowing of and after learning of the defective nature of EIFS. EIFS is uniformly defective as designed and manufactured in the United States because, *inter alia*, when it is exposed to moisture under normal weather conditions, the moisture intrudes and becomes trapped between the EIFS and the structure and interior finishes of the walls. Unable to "escape," the trapped moisture causes wood to rot and decay, and steel to corrode, and promotes mold growth in and

> insect infestation of wood, drywall, masonry and insulation. If unchecked, these problems ultimately result in significant structural damage to the house. In sum, notwithstanding Defendants' representations otherwise, EIFS, as designed and furnished by the Defendants, is defective as a barrier system, because it allows damaging moisture intrusion behind the exterior cladding of a home.

(*Id.* ¶ 2.) Plaintiffs' complaint includes claims for (1) fraud and suppression; (2) intentional, reckless or negligent misrepresentation; (3) violation of consumer protection statutes; (4) breach of express warranty; (5) breach of implied warranty; (6) strict liability; and (7) negligence. In their briefing on the class certification issue, however, plaintiffs indicate that they will not pursue their claims for fraud or negligent misrepresentation on a classwide basis. (Pls.' Reply to Dryvit, Thoro, Synergy, Parex, and STO's Mem. in Opp'n to Pls.' Mot. for Class Certification ("Pls.' Reply to Dryvit Defs.' Resp.") at 17.) Plaintiffs seek a declaratory judgment, injunctive relief, and compensatory and punitive damages.

### II. *Discussion*

 The party seeking class certification bears the burden of proof. *See In re A.H. Robins Co., Inc.*, 880 F.2d 709, 728 (4th Cir.), *cert. denied sub nom., Anderson v. Aetna Cas. & Sur. Co.*, 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989); *see also In re Am. Med. Sys. Inc.*, 75 F.3d 1069, 1085 (6th Cir.1996). Rule 23(a) contains four prerequisites which must be met before a class can be certified. Once the conditions of Rule 23(a) are met, the party seeking certification must also demonstrate that the class falls within one of the subcategories of Rule 23(b). The court must conduct a "rigorous analysis" of the Rule 23 prerequisites. *General Tel. Co. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 2372–73, 72 L.Ed.2d 740 (1982); *A.H. Robins*, 880 F.2d at 728.

Plaintiffs move for class certification pursuant to Fed.R.Civ.P. 23(a) and 23(b)(3). Rule 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on

behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

Rule 23(b) provides, in relevant part:

An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

. . . .

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b).

In support of their argument for class certification, plaintiffs rely on *Central Wesleyan College v. W.R. Grace & Co.,* 6 F.3d 177 (4th Cir.1993). In *Central Wesleyan,* the Fourth Circuit affirmed the district court's conditional certification of a Rule 23(b)(3) class consisting of United States colleges and universities that had suffered property damage due to the presence of friable asbestos in their facilities. *Id.* at 181. The class action complaint sought compensation for the costs of controlling and eventually removing the asbestos as required by federal law. *Id.* The complaint also sought punitive damages. *Id.*

Rather than reading *Central Wesleyan* as a ringing endorsement of class certification, this court reads the case as a cautious affirmance of the trial court's decision under the abuse of discretion standard. *See, e.g., id.* at 180 ("Although manageability problems present concerns in a lawsuit of this magnitude, the class mechanism may advance this action and reduce the need for repetitive litigation in this area." (emphasis added)); *id.* at 182 ("[I]t is apparent to us that the verdict is still out on the utility of mass asbestos litigation procedures ..."); *id.* at 185 ("While we are not unsympathetic to defendants' arguments, we are also not prepared to conclude that the district court abused its discretion .... "); *id.* at 186 ("While the district court has acted within its direction and while limited certification of the class may yield significant benefits, it is acknowledged by all that this litigation is not without difficulties. This enormous undertaking is fraught with potential problems that may well offset the advantages that the class mechanism might afford."); *id.* at 188 ("[D]efendants have pointed to manageability problems in this litigation as a *reason for* denying class certification. We cannot say that their concerns are unfounded."). Significantly, the Fourth Circuit repeatedly noted that the class certification "may have to be reconsidered" by the district court. *Id.* at 186. It stated: "As this litigation proceeds, the district court must make certain that manageability and other types of problems do not overwhelm the advantages of conditional certification. Should such concerns render the class mechanism ineffective, the district court must be prepared to use its considerable discretion to decertify the class." *Id.* at 189. The court also warned that manageability problems may overwhelm the litigation:

Even assuming that resolution of the ... conditionally certified issues advances the litigation, a daunting number of individual issues still loom beyond the Phase One proceeding. To establish liability, each college and university must demonstrate that a defendant's product has caused, or will cause, the institution to incur costs of asbestos maintenance and removal. Questions of comparative fault may need to be examined in light of the role of profession-

al engineers and architects at the various colleges played in purchasing, installing, and maintaining the asbestos. Different time bar defenses may need to be considered depending on when class members have removed the asbestos from their buildings. Adjudication of damages alone presents an array of issues regarding costs of removal, including the nature of the asbestos product, its condition, location, accessibility, and even labor rates in varying locales.

... [S]ome [of the certified questions] are mixed questions of law and fact, such as whether defendants breached a duty of care and whether they could be liable for punitive damages. Resolution of these issues may require consideration of the laws of the jurisdiction where a particular college or university is located. Instructing a jury on the laws of multiple jurisdictions will be a significant task, and one that has not been resolved in over ten years of *School Asbestos Litigation*. Even the district court's suggested use of subclasses to consider different state laws will pose management difficulties and reduce the judicial efficiency sought to be achieved through certification.

*Id.* at 188–89 (citation omitted).

The *Central Wesleyan* court distinguished the case before it from *A.H. Robins*, another case upon which plaintiffs rely. *A.H. Robins*, the Fourth Circuit stated,

was a mass tort suit involving only a single defendant, Aetna Insurance, and a single product, the Dalkon Shield, sold for only four years by a single company, A.H. Robins. Although the case had been litigated for many years on many issues, the class action boiled down to the issue of whether Aetna was a joint tortfeasor in the development and marketing of the allegedly defective product.

*Id.* at 189. In contrast, the Fourth Circuit stated, "college asbestos litigation involves dozens of defendants, hundreds of asbestos products sold over decades, and a wealth of individual issues, making it less easy to con-

clude that one issue, or even eight, predominate." *Id.*

■ This case also differs from *A.H. Robins*. It involves numerous defendants and many products sold by many companies.[1] There is no history of litigation over EIFS that has helped to crystalize the issues and the case implicates multiple causes of action asserted under the laws of every state. Most significantly, however, this case is distinguishable from *A.H. Robins* because of the role of third parties, such as contractors, EIFS applicators, architects, and window manufacturers, in the construction of plaintiffs' homes. At the class certification hearing, plaintiffs agreed to stipulate that these third parties were negligent.

The relevance of third parties to the EIFS litigation cannot be disputed. Other lawsuits have been filed suing EIFS manufacturers on claims similar to those raised in this case. In those cases, the plaintiffs have also asserted claims against third parties such as builders, architects, and EIFS applicators. Those cases include a lawsuit filed in North Carolina state court by named plaintiffs in this litigation. *See Todd v. Eddie Evans Constr., Inc.*, No. 96CV02148 (New Hanover County, N.C. Gen. Ct. Justice, Super. Ct. Div. filed June 26, 1996). In the state court action, plaintiffs allege, among other things, negligence on the part of the builder and EIFS applicator. The complaint alleges, for example, that the builder "[f]ail[ed] to install EIFS in accordance with manufacturer's recommendations and accepted industry practice," *id.* ¶ 22a, "[f]ail[ed] to caulk around exterior penetrations in a proper manner," *id.* ¶ 22b, and "[f]ail[ed] to repair known leaks." *Id.* ¶ 22c. The cases naming EIFS manufacturers and third parties also include actions in which the plaintiffs are represented by counsel for plaintiffs in this action, *see id.* (plaintiffs represented by *In re Stucco Litigation* liaison counsel), and a case in which the plaintiff is a member of one of the law firms representing plaintiffs in this litigation. *Motley v. Corey Am., Inc.*, No. 96–CP–10–1874 (Charleston County, S.C. Ct. C.P.

---

1. Plaintiffs argue that the products are all essentially the same. (Pls.' Mem. at 1.) Defendants disagree. (*See, e.g.,* Dryvit Defs.' Resp. at 2 n. 2.)

filed May 31, 1996)(lawsuit brought by Ronald L. Motley of Ness, Motley, Loadholt, Richardson & Poole).

Noting the relevance of third parties to this dispute, defendants argue that individual questions of fact predominate because the claims of every class member will require an assessment of the conduct of third parties such as builders, contractors, subcontractors, EIFS applicators, architects, window manufacturers and others, involved in the construction of each home. According to defendants, the role of these parties is relevant to liability, causation, and comparative fault determinations.

Defendants argue that because there is evidence that third parties' negligence was a proximate cause of plaintiffs' damages, the comparative fault issue must be submitted to the jury. Plaintiffs argue that nothing prohibits defendants from pursuing subsequent lawsuits for contribution and indemnity. In at least one jurisdiction, however, defendants will be barred from obtaining contribution from joint tortfeasors that are not made parties to this action. *See* Mich. Laws Ann. § 600.2925a(5) (1997)("A tort-feasor who satisfies all or part of a judgment entered in an action for injury ... is not entitled to contribution if the alleged contributee was not made a party to the action and if a reasonable effort was not made to notify him of the commencement of the action."); *see also Royal Indem. Co. v. H.S. Watson Co.*, 93 Mich.App. 491, 287 N.W.2d 278, 280 n. 1 (1979)(per curiam)(§ 600.2925(a)(5) "specifically requires notice and opportunity to defend as elements of the statutory right to contribution"). If, however, the court allows joinder of third parties so that comparative fault can be determined, individual issues will overshadow any common questions that exist. Since different builders, architects, applicators, and window manufacturers were involved with each home, comparative fault would have to be decided individually for each class member's claim. On the other hand, since the federal rules cannot abridge defendants' substantive right to obtain contribution, see 28 U.S.C. § 2072 (1994)(federal rules of practice and procedure "shall not abridge, enlarge or modify any substantive right"), prohibiting joinder to save the class is not an option.

Most jurisdictions do not bar subsequent actions for contribution if the alleged joint tortfeasors are not made parties to the "main" litigation. Thus, for most jurisdictions, prohibiting joinder would not abridge substantive rights. However, the procedure of allowing the class but prohibiting joinder in these jurisdictions raises a different concern. In order to pursue third parties for contribution, defendants will have to institute a second round of litigation, which will necessarily proceed on a house-by-house basis. That class certification will not obviate—and in fact will create—this second round of litigation calls into question the superiority of the class action procedure.[2]

In addition to the individualized issues related to the role of third parties, the question of compensation for physical damage to the homes will implicate myriad "house specific" issues, including but not limited to the type of repair needed on each house,[3] local building code requirements, the costs of materials needed for the repairs, and labor rates in varying locales. *See Central Wesleyan*, 6 F.3d at 189 ("Adjudication of damages alone presents an array of issues regarding costs of removal, including the nature of the asbestos product, its condition, location, accessibility, and even labor rates in varying locales."). Likewise, an analysis of diminution in value will require individualized inquiries into items such as the market value of the affected homes and of comparable non-EIFS homes in the area.

■ Variations in state law present further problems for the proposed class. The

---

**2.** Plaintiffs may argue that the tortfeasors, not the plaintiffs, should be burdened with the costs of case-by-case adjudication. However, since this case involves an "immature tort," *see infra*, it has yet to be determined what portion of the liability, if any, is attributable to defendants.

**3.** Not all plaintiffs plan to remove the EIFS. (*See* Lamoureux Dep. at p. 28 (Q: "Do you have any plans to remove the EIFS system at this time?" A: "No.")). Also, plaintiffs allege varying damages. (*Compare* Lukban Dep. at pp. 14–15 (termite damage), *with* Lamoureux Dep. at p. 28 (no termite problems).)

Fifth Circuit has warned that "[i]n a multistate class action, variations in state law may swamp any common issues and defeat predominance." *Castano v. American Tobacco Co.*, 84 F.3d 734, 741 (5th Cir.1996). Variations in state law may also create insuperable management problems. *See Central Wesleyan*, 6 F.3d at 189. Here, plaintiffs suggest that differences in state law are manageable through the use of subclasses and jury interrogatories. Specifically, they propose subclasses for breach of express warranty, breach of implied warranty, negligence, unfair and deceptive trade practices, and punitive damages.

■ Defending their breach of express warranty subclass, plaintiffs assert that since the District of Columbia and all the states except Louisiana have adopted Section 2–313 of the Uniform Commercial Code, "[t]he standards for liability are ... the same for all persons in this subclass, and the claim can be tried on a class-wide basis." (Mem. in Supp. of Pls.' Mot. for Class Certification ("Pls.' Mem.") at 28.) Plaintiffs' showing is insufficient. Judge Ruth Bader Ginsburg, writing for a panel of the District of Columbia Circuit Court of Appeals, rejected a similar general assertion of uniformity:

> Appellees ... say no variations in state warranty laws relevant to this case exist. A court cannot accept such an assertion "on faith." Appellees, as class action proponents, must show that it is accurate. We have made no inquiry of our own on this score and, for the current purpose, simply note the general, unstartling statement made in a leading treatise: "The Uniform Commercial Code is not uniform."

*Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1016 (D.C.Cir.1986) (Ruth Bader Ginsburg, J. and Edwards, J.)(footnotes omitted), *cert. denied*, 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 677 (1987).

■ Plaintiffs defend their punitive damages subclass arguing that disparities in state law can be managed with jury interrogatories. State punitive damages law varies not only in terms of the conduct required to obtain punitives, *compare* Ala.Code. § 6–11–20(a) (1996)("oppression, fraud, wantonness, or malice"), *with* Mont.Code Ann. § 27–1–221

(1995)(actual fraud or actual malice), but also in terms of the burden of proof required. *Compare* Idaho Code § 6–1604(1) (1997)(preponderance of the evidence), *with* Ala.Code. § 6–11–20(a) (clear and convincing). Any instructions attempting to account for these variations would surely baffle a jury.

■ Plaintiffs' negligence subclass contains forty-four jurisdictions. According to plaintiffs,

> Each of these jurisdictions define negligence by four elements, (1) duty; (2) breach of duty; (3) proximate cause; and (4) injury. States that abrogate claims in negligence by statute ... have been excluded from the subclass as have states in which the focus of the liability inquiry is on the product itself and not the manufacturer's conduct.... Accordingly, this Court can easily try the common issues related to the negligence claims on a class-wide basis.

(Pls.' Mem. at 25–26. (footnotes omitted).) Plaintiffs do not argue that there are no differences in state negligence law. (*See id.*) Rather, they seem to suggest the differences are minor. The devil, however, is in the details.

> [N]uance can be important, and its significance is suggested by a comparison of differing state pattern instructions on negligence and differing judicial formulations of the meaning of negligence and the subordinate concepts. The common law is not a brooding omnipresence in the sky, but the articulate voice of some sovereign or quasi sovereign that can be identified. The voices of the quasi-sovereigns that are the states of the United States sing negligence with a different pitch.

*In re Rhone–Poulenc Rorer Inc.*, 51 F.3d 1293, 1300–01 (7th Cir.) (citations and quotation omitted)(writ of mandamus ordering district court to decertify nationwide class action), *cert. denied*, — U.S. ——, 116 S.Ct. 184, 133 L.Ed.2d 122 (1995). Plaintiffs provide no detail on the exact nature of the differences in state law. Moreover, while they indicate that jury instructions can be crafted to accommodate the differences in law, no sample instructions are provided. The court thus has some concern about how

it would handle variations in state negligence law. Of course, the court must give effect to the variations in state law, however minor they may be. *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

Plaintiffs' unfair and deceptive trade practices subclass consists of the District of Columbia and the forty-six states which have (1) enacted statutes prohibiting unfair and deceptive business practices; (2) allow a private cause of action; and (3) do not require reliance. By excluding from this subclass states requiring reliance, plaintiffs have removed one significant difference in state law. There are, however, other differences. Some states prohibit unfair and deceptive trade practices generally. *See, e.g.,* Conn. Gen.Stat. § 42–110b(a) (1997)("[n]o person shall engage in ... unfair or deceptive acts or practices in the conduct of any trade or commerce"). Other states' statutes provide a list of prohibited practices. *See, e.g.,* Pa.Stat.Ann. tit. 73 § 201–2(4) (West 1996)("'unfair or deceptive acts or practices' mean[s] any one or more of the following...."). Some statutes require that the act be done knowingly. *See, e.g.,* Utah Code Ann. § 13–11–4 (1996)("[A] supplier commits a deceptive act or practice if the supplier knowingly or intentionally...."). Others do not. *See, e.g.,* Conn. Gen.Stat. § 42–110b(a). These variations further compound the management problems associated with litigating this case as a class action.

Two last points on plaintiffs' subclasses are in order. First, all of the subclasses exclude some jurisdictions and plaintiffs acknowledge that "many more states are likely to be excluded as the case develops." (Pls.' Mem. at 25.) No clarification is offered as to how many more states might be excluded. If a large number of states are ultimately excluded, the efficiency hoped to be obtained by a class action will be diminished. This is particularly so if individuals who remain class members in this litigation file independent actions on claims that are excluded from the class.

Second, plaintiffs' briefs suggest that a number of additional subclasses will be needed to accommodate this litigation. Responding to U.S. Gypsum's argument that its defenses differ from those of the other defendants because it was never a member of the EIFS Industry Manufacturers' Association ("EIMA"), plaintiffs state: "USG ignores the fact that subclasses against each defendant can be created to deal with differences, if any among EIFS manufacturers and their defenses." (Pls.' Reply to Continental, Finestone, European Stucco, Pleko, and U.S. Gypsum's Resp. at 7.) Additionally, with regard to conflicts of interest between the plaintiffs, *see infra,* plaintiffs assert: "If such conflicts were to emerge, the Court could ... create additional subclasses...." (Pls.' Supplemental Mem. at 8 n. 16.) Finally, plaintiffs concede that a recent federal case held it is not appropriate to group together plaintiffs from all jurisdictions in one punitive damages subclass. (*Id.* at 14.) Accordingly, plaintiffs request that they be allowed to "reformulate [the punitive damages] subclass and resubmit it for reconsideration." (*Id.*) The specter of even more subclasses adds to the court's concerns with management of this litigation.

■■■ Several additional factors caution against class certification. First, there is some question as to whether the amounts at stake for the individual class members are so small that separate suits will be impracticable. Plaintiffs allege that "each Plaintiff and every member of the proposed Plaintiff Class" meets the $50,000 minimum jurisdictional amount. (Am.Compl. ¶ 4.) While plaintiffs concede that "the damages of some are significant enough to warrant individual litigation," they argue that "the damage to most class members will be less than $100,000, not nearly enough to litigate a case of this complexity." (Pls.' Mem. at 20.) No evidence, however, was offered in support of this latter assertion. On the other hand, it has been noted that "[t]he expense of litigation does not necessarily turn [the] case into a negative value suit [where] the prevailing party may recover attorneys' fees under many consumer protection statutes." *Castano,* 84 F.3d at 748. Moreover, at the hearing, defendants argued that in addition to this action, some 100 individual cases have already been filed; this fact further supports

the notion that individual lawsuits are viable.[4]

The not insignificant damages sought by the plaintiffs and the number of independent actions already filed also raises some concern as to the potential size of the opt out class. At the hearing, plaintiffs provided no evidence regarding the number of class members that may exercise their opt out rights. *See Central Wesleyan*, 6 F.3d at 183 ("a vast majority of the colleges surveyed had indicated that they would not opt out of the class"). If that number is large, the class litigation will fail to achieve economies of scale. *See id.* at 189–90 ("If . . . so many colleges and universities opt out of the voluntary class that it no longer promises to achieve economies of scale on common issues, the district court should reconsider its conditional certification.").

■ Another factor weighing against certification is that this litigation involves an "immature tort."

Fairness may demand that mass torts with few prior verdicts or judgments be litigated first in smaller units—even single-plaintiff, single-defendant trials—until general causation, typical injuries, and levels of damages become established. Thus, "mature" torts like asbestos or Dalkon Shield may call for procedures that are not appropriate for incipient mass tort cases, such as those involving injuries arising from new products, chemical substances, or pharmaceuticals.

Manual for Complex Litigation (Third) § 33.26 (1997); *see also Castano*, 84 F.3d at 748–49 (quoting same).

■ Further, the court has some concern regarding the typicality of the named plaintiffs. Defendants contend that the named plaintiffs lack standing to assert claims against all defendants because they do not have EIFS products manufactured by all defendants on their homes. Although class certification issues must be decided before standing issues, *Amchem Products, Inc. v.*

*Windsor*, —— U.S. at —— – ——, 117 S.Ct. at 2244–45 (1997), defendants' argument raises a question regarding the typicality of the named plaintiffs' claims. *See La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461 (9th Cir.1973). Plaintiffs claim that because the complaint contains allegations of conspiracy, the standing argument (and presumably the typicality argument) is without merit. Plaintiffs, however, have abandoned their fraud and negligent misrepresentation claims. (Pls.' Reply to Dryvit Defs.' Resp. at 17.) Since plaintiffs' conspiracy allegations relate only to these claims, it appears that the conspiracy allegations are no longer part of the case. Moreover, even if plaintiffs' conspiracy allegations were part of the case, the problem would not be entirely alleviated; while plaintiffs allege the conspiracy occurred through EIMA, not all defendants were members of that association. (*See* Dahlberg Dep. at p. 62 (stating that U.S. Gypsum has never been a member of EIMA).)

This case also presents questions as to the adequacy of the class representatives. In *Amchem*, the Supreme Court held, in part, that the class at issue did not satisfy Rule 23(a)'s adequacy prong. *Amchem*, —— U.S. at —— – ——, 117 S.Ct. at 2250–51. The class included plaintiffs who had been exposed to asbestos and were already injured as well as those that were exposed to asbestos and had not yet manifested any injury. According to the Court: "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Id.* The Court found such a conflict in the case before it: "[F]or the currently injured, the critical goal is generous immediate payments. That goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future." *Id.*

4. Of course, Rule 23 "does not exclude from certification cases in which individual damages run high." *Amchem Prods., Inc. v. Windsor*, —— U.S. at ——, 117 S.Ct. at 2246 (1997). However, [t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor. *Id.* (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir.1997)).

■ Relying on *Amchem,* defendants argue that there is a conflict of interest between the plaintiffs whose homes already have been physically damaged and those whose homes have not yet suffered such damage. Plaintiffs contend that this distinction is irrelevant because all of the homes suffer "stigma" damage as a result of being constructed with an EIFS. In support of this assertion, plaintiffs offer the affidavit of Wilbur H. Mundy. In his affidavit, Mundy states that he conducted valuation research on EIFS homes in Seattle, Washington and Wilmington, North Carolina. (*See* Mundy Aff. ¶ B.4.) He states: "EIFS siding has 'stigmatized' properties where the presence of this siding is recognized. It is likely that the values of property in the class have been reduced as compared with similar properties not subject to the same siding problems." (*Id.* ¶ C.6.) Mundy's affidavit is deficient. First, his research was limited to two areas with similar climatic conditions. (*Id.* ¶ B.4.b.) This, however, is a nationwide class action involving a product that, as admitted by plaintiffs, performs differently in different climatic conditions. (*See, e.g.,* Pls.' Reply to Dryvit Defs.' Resp. at 29 (noting that homes located in dry regions may not suffer harm).) Second, Mundy's affidavit indicates that "stigma" only occurs where "the presence of [EIFS] is recognized." (Mundy Aff. ¶ C.6.) Significantly, in Seattle, one of the two study areas, Mundy found that "there is not knowledge of the EIFS systems problems on the part of the brokerage community, or the homebuying segment of the market." (*Id.* ¶ B.4.b.) This suggests that Seattle EIFS homes have not experienced "stigma" damages. Consistent with this conclusion, Mundy can only state that "it is likely" that the values of EIFS homes have been reduced as compared to non-EIFS homes. (*Id.* ¶ C.6.)

Plaintiffs also assert that "[u]nlike *[Amchem],* where exposure to a toxic substance may or may not result in harm, *all* EIFS homes (with the possible exception of some homes located in unusually dry regions) will suffer harm." (Pls.' Reply to Dryvit Defs.' Resp. at 29; *see also* Pls.' Supplemental Mem. at 7 (same).) The inconsistency of this argument is apparent; if homes in dry regions will not suffer harm, "*all* EIFS homes" will not suffer harm.

■ One final issue remains. Plaintiffs suggest that the court must consider whether certification will promote settlement. Here, while the parties engaged in settlement negotiations, those negotiations were unsuccessful and the case is not presented as a "settlement-only" class.[5] Although "settlement is relevant to a class certification," *Amchem,* — U.S. at ——, 117 S.Ct. at 2248, settlement considerations do not affect the court's predominance analysis. *See id.* at ——, 117 S.Ct. at 2249 ("The benefits ... persons might gain from ... a grand-scale compensation scheme ... [are] not pertinent to the predominance inquiry"). Furthermore, while a district court "[c]onfronted with a request for settlement-only class certification ... need not inquire whether the case, if tried, would present intractable management problems," *id.* at ——, 117 S.Ct. at 2248, this is not a settlement-only class. Thus, the management problems identified by the court are not made moot by settlement considerations. Even if settlement must be considered, the court finds that in this case, the combined difficulties associated with the various requirements of Rule 23 preclude certification.

For the reason discussed above, plaintiffs' motion for class certification is DENIED. It is further ORDERED that within seven days from the date of this order, the parties are to file a joint scheduling and discovery plan for these cases.

---

**5.** At the class certification hearing, however, U.S. Gypsum announced that it reached a settlement with plaintiffs. No settlement papers have yet been presented to the court.