Wachovia Bank v. Harbinger Capital Partners Master Fund I, Ltd., 2008 NCBC 6

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| COUNTY OF MECKLENBURG | Civil Action No: 07 CVS 5097 |

WACHOVIA BANK, NATIONAL
ASSOCIATION and WACHOVIA CAPITAL
MARKETS, LLC

                            Plaintiffs,

    v.

HARBINGER CAPITAL PARTNERS
MASTER FUND I, LTD., d/b/a
HARBINGER CAPITAL PARTNERS
MASTER FUND 1, d/b/a HARBINGER
CAPITAL PARTNERS MASTER FUND I,
AURELIUS CAPITAL MASTER, LTD.,
AURELIUS CAPITAL PARTNERS, LP,
LATIGO MASTER FUND, LTD.,
HARBINGER CAPITAL PARTNERS
OFFSHORE MANAGER, L.L.C.,
AURELIUS CAPITAL MANAGEMENT, LP,
AURELIUS CAPITAL GP, LLC, LATIGO
PARTNERS, L.P., SCHULTZE MASTER
FUND, LTD., UBS WILLOW FUND, L.L.C.,
ARROW DISTRESSED SECURITIES
FUND, AND BOND STREET CAPITAL
LLC,

                            Defendants.

ORDER & OPINION

*Robinson, Bradshaw & Hinson, P.A. by Martin L. Brackett, Jr. and Robert W. Fuller for Plaintiffs Wachovia Bank, National Association and Wachovia Capital Markets, LLC.*

*Rayburn Cooper & Durham, P.A.. by James B. Gatehouse, C. Richard Rayburn, Jr., and Ross R. Fulton for Defendants Harbinger Capital Partners Master Fund I, LTD., d/b/a Harbinger Capital Partners Master Fund 1, d/b/a Harbinger Capital Partners Master Fund I, Aurelius Capital Master, LTD., Aurelius Capital Partners, LP, Latigo Master Fund, LTD., Harbinger Capital Partners Offshore Manager, LLC, Aurelius Capital Management, LP, Aurelius Capital GP, LLC, Latigo Partners, L.P., Schultze Master Fund, LTD., UBS Willow Fund, LLC, Arrow Distressed Securities Fund, and Bond Street Capital LLC.*

Diaz, Judge.

{1}    Before the Court are the following Motions:  (1) Defendants' Motion to Dismiss for Lack of Personal Jurisdiction (the "Motion to Dismiss"), (2) Defendants' Motion to Dissolve Preliminary Injunction and Stay Action (the "Motion to Stay"), and (3) Plaintiffs' Motions for Civil Contempt and for Enforcement of Preliminary Injunction (the "Motion for Contempt").

{2}    After considering the Court file, the written motions, the briefs and exhibits submitted by the parties, and the arguments of counsel, the Court **GRANTS** the Motion to Stay, and (in light of this decision) defers further action on the Motion to Dismiss and the Motion for Contempt.

{3}    The Court also modifies the preliminary injunction order in this case, as more specifically set forth below.

I.

FINDINGS OF FACT

A.

THE PARTIES

{4}    Wachovia Bank ("Wachovia") is a national banking association with its principal place of business located in Mecklenburg County, North Carolina.  (Compl. ¶ 12.)

{5}    Wachovia Capital Markets, LLC ("WCM") is a Delaware limited liability company with its principal place of business in Mecklenburg County, North Carolina.  (Compl. ¶ 13.)[1]

{6}    WCM is a Wachovia affiliate. (14 Mar. 2007 Harkness Aff. ¶ 2.)

---

[1] On 28 February 2008, Plaintiffs amended their Complaint to clarify that WCM is a single member LLC with three individual managers.

{7}     Defendants are all foreign entities, none of whom maintain offices in this state.  According to Plaintiffs, however, "[e]ach of the defendants has engaged in business in North Carolina through dealings with the Charlotte office of Wachovia, as Administrative Agent for the lending syndicate, and otherwise."  (Compl. ¶ 28.)

{8}     Plaintiffs' Complaint (filed on 14 March 2007) identifies Defendants Harbinger Capital Partners Master Fund I Ltd., Aurelius Capital Master, Ltd., Aurelius Capital Partners, LP, Schultze Master Fund, Ltd., UBS Willow Fund, LLC, Arrow Distressed Securities Fund, and Latigo Master Fund, Ltd., collectively, as the "Fund Defendants."  (Compl. ¶ 6.)

{9}     The Complaint identifies the remaining Defendants (Harbinger Capital Partners Offshore Manager, LLC, Aurelius Capital Management, LP, Aurelius Capital GP, LLC, Bond Street Capita1 LLC, and Latigo Partners, LP, collectively, as the "Agent Defendants."  (Compl. ¶ 51.)

B.

THE CLAIMS

1.

THE CREDIT AGREEMENT

{10}    This case arises out of Wachovia's role as administrative agent for a $285 million loan commitment ("the Credit Agreement") made to Le-Nature's, Inc. ("Le-Nature's" or the "Company"), a Pennsylvania entity that at one time was in the business of developing and marketing bottled water and other noncarbonated beverages.  (14 Mar. 2007 Harkness Aff. ¶ 3, Exs. G, K.)

{11}    Wachovia funded a portion of the Credit Agreement directly and created a syndicate of lenders to fund the balance (hereinafter the "Credit Facility").[2]  (Compl. ¶ 4; 14 Mar. 2007 Harkness Aff. ¶ 5.)

---

[2] As Defendants explained in their letter requesting assignment of this case to the Business Court, "[i]n the syndicated loan market, a lender issues large loans to borrowers by breaking the larger overall loan into smaller 'syndicated' pieces, thus diluting any one lender's exposure on the debt." Letter from C. Richard Rayburn, Jr., counsel for Defendants, to the Honorable Robert P. Johnston, Senior Resident Superior Court Judge (Apr. 25, 2007).

{12} Although not a party to the Credit Facility, WCM served as Lead Arranger and Sole Bookrunner for the transaction.[3] (Compl. ¶¶ 1, 4.)

{13} The syndicate of lenders were assigned their interests in the Credit Facility after executing a form Commitment Transfer Supplement (the "Supplement"), which was included as an exhibit to the Credit Agreement. (14 Mar. 2007 Harkness Aff. ¶ 5.)

{14} Le-Nature's is now bankrupt, following the discovery of a massive fraud apparently perpetrated by the Company's management which, among other things, involved the dissemination of inflated profit reports (and related false financial statements) to the public, including Le-Nature's creditors. (Compl. ¶¶ 1, 4, 44–47.)

2.

PLAINTIFFS' CONTENTIONS

{15} Plaintiffs allege the Fund Defendants (acting in some instances by and through the Agent Defendants) purchased certain interests in the Credit Facility from various original syndicate lenders, after news of Le-Nature's fraud became public. (Compl. ¶ 2; 14 Mar. 2007 Harkness Aff. ¶¶ 13, 15.)

{16} Plaintiffs further allege the Fund Defendants acquired their interests in the Credit Facility with an eye toward pursuing contract and tort claims against Plaintiffs as a result of Le-Nature's financial demise. (Compl. ¶ 2.)

{17} According to Plaintiffs, the Fund Defendants obtained their interests in the Credit Facility by executing Supplements and, in so doing, became parties to the Credit Agreement. (Compl. ¶ 39.)

{18} The Credit Agreement states that North Carolina law shall govern the "rights and obligations of the parties under this Agreement." (14 Mar. 2007 Harkness Aff. Ex. A § 9.13.)

{19} Plaintiffs filed this lawsuit following Defendants' public proclamations of their intent to "hold Wachovia and WCM responsible for losses caused . . . by the Le-Nature's fraud." (Compl. ¶ 2.)

---

[3] Essentially, WCM was the lead underwriter and custodian of the relevant books and records for the Credit Facility. (14 Mar. 2007 Harkness. Aff. ¶¶ 5, 7, 15.)

{20} Plaintiffs contend the Fund Defendants' acquisition of interests in the Credit Facility is governed by North Carolina law, which (they say) "flatly" prohibits the assignment of tort claims. (Compl. ¶ 2.)

{21} Accordingly, Plaintiffs seek a declaratory judgment from this Court as to the effectiveness and enforceability under North Carolina law of any tort claims purportedly assigned to the Fund Defendants (either directly or through their agents) under the Credit Facility. (Compl. ¶ 9.)

{22} Plaintiffs also assert affirmative claims for champerty, maintenance,[4] and unfair and deceptive trade practices, based on the Fund Defendants' acquisition of tort claims under the Credit Facility. (Compl. ¶¶ 81–92, 100–06.)

{23} Pursuant to the Credit Agreement, Wachovia also seeks indemnification from the Fund Defendants for a portion of the over $1 million in expenses and costs it claims to have incurred as administrative agent in connection with Le-Nature's bankruptcy proceedings. (Compl. ¶ 8.)

3.

## DEFENDANTS' CONTENTIONS

{24} Defendants dispute this Court's jurisdiction over them, alleging they have no contacts with North Carolina sufficient to require them to defend against Plaintiffs' claims in this state.

{25} As to the substance of the claims, the Fund Defendants contend there is nothing untoward about the manner in which they acquired their interests in the Credit Facility.

{26} Defendants assert that trading in "distressed debt"[5] is an established part of the commercial loan industry. Defendants state that such trading is

---

[4] "'[M]aintenance' [is] an officious intermeddling in a suit, which in no way belongs to one, by maintaining or assisting either party with money or otherwise to prosecute or defend it. 'Champerty' is a form of maintenance whereby a stranger makes a bargain with a plaintiff or defendant to divide the land or other matter sued for between them if they prevail at law, whereupon the champertor is to carry on the party's suit at his own expense." *Wright v. Commercial Union Ins. Co.*, 63 N.C. App. 465, 469, 305 S.E.2d 190, 192 (1983) (internal citations and quotation marks omitted).
[5] "Distressed debt" is debt that "is or is perceived to be in some degree of financial distress that impairs the prospects of full and timely repayment." (21 Mar. 2007 Ganz Aff. ¶ 6.)

accomplished through standardized practices developed as part of a national secondary loan market.[6]  (Defs.' Br. Supp. Mot. Stay 5–6.)

{27}  According to Defendants, the organization at the forefront of efforts to more efficiently manage the secondary loan market is the Loan Syndications and Trading Association (the "LSTA"), which Defendants describe as a non-profit trade association "dedicated to the promotion and orderly development of a fair, efficient, liquid, and professional trading market for commercial loans."  (Defs.' Br. Supp. Mot. Stay 5.)

{28}  Defendants allege they purchased their interests in the Credit Facility pursuant to "standard terms and conditions" established by the LSTA (the "Standard Terms"), and that such terms require (among other things) the application of New York law to the assignment of rights in the Credit Facility. (Defs.' Br. Supp. Mot. Stay 6; 14 Mar. 2007 Harkness Aff. Ex. H.)

## C.

## THE TRO AND PRELIMINARY INJUNCTION

{29}  On the same day Plaintiffs filed their Complaint, they moved for and obtained a temporary restraining order ("TRO") enjoining Defendants from "asserting, filing, prosecuting, attempting to assign or re-assign, or otherwise pursuing any Personal Tort Claims against Plaintiffs or any of their agents . . . that arise from or relate in any respect to credit extended by any entity to Le-Nature's Inc."  (TRO 6.)

{30}  The TRO defines "Personal Tort Claims" broadly to include

> each and every of the following statutory or common law claims or causes of action, *whether under the law of North Carolina or of any other state*:  (i) claims for fraudulent and negligent omissions or misrepresentations, or both, (ii) claims alleging constructive fraud, (iii) negligence claims, (iv) breach of fiduciary duty claims, (v) tortious interference claims, (vi) unfair trade practice claims, (vii) racketeering claims, (viii) conspiracy with respect to or to commit any of the aforelisted claims, or to commit any other wrongful act or omission,

---

[6] Defendants assert that "[i]n 2006, the volume of the U.S. secondary loan trading market was approximately $239 billion, of which . . . $40 billion or 17% was 'distressed debt.'"  (21 Mar. 2007 Ganz Aff. ¶ 6.)

and (ix) aiding or abetting with respect to or to commit any of the aforelisted claims, or to commit any other wrongful act or omission.

(TRO 6–7 (emphasis added).)

{31} On 12 April 2007, Superior Court Judge Robert C. Ervin converted the TRO into a preliminary injunction, which effectively enjoined Defendants from pursuing their Personal Tort Claims against Plaintiffs in any court other than this one.

{32} Following entry of the preliminary injunction, this case was transferred to the North Carolina Business Court.

D.

THE NEW YORK ACTION

{33} On 17 September 2007 (six months after Plaintiffs filed suit in North Carolina), seven of the eight original Fund Defendants,[7] along with ten other parties who purchased interests in the Credit Facility (either directly from Plaintiffs in the syndication process or in the secondary loan market), filed an 85-page complaint in the Federal District Court for the Southern District of New York (the "SDNY") against WCM, BDO Seidman, LLC (Le-Nature's independent auditors) and two of Le-Nature's senior corporate officers (hereinafter the "New York Action").[8]

{34} Defendants allege in the New York Action that "[WCM], unlike [Defendants], knew about Le-Nature's' improper practices and struggling finances long before completion of the . . . Credit Facility, yet chose to press forward with the loan and its syndication to advance its own agenda, as well as that of its affiliates."[9] (N.Y. Compl. ¶ 5.)

---

[7] Defendants Taconic Opportunity Fund, L.P. and Taconic Capital Management, LLC, have settled with Plaintiffs and thus, are no longer parties to the North Carolina action. (Pls.' Mot. Contempt 2.)
[8] Wachovia is not a named defendant in the New York Action.
[9] That agenda (according to Defendants) included WCM's "strong desire to build up its fledging high-yield bond business, which was dependent on generating financing transactions for mid-market companies such as Le-Nature's." (N.Y. Compl. ¶ 59.) To that end, WCM was willing (again according to Defendants) to "expand its high-yield underwriting business through *quantity*, rather than quality, and was willing to underwrite deals that other banks were not even willing to consider

{35}  Put bluntly, Defendants allege that WCM "knew that Le- Nature's was engaging in fraud." (N.Y. Compl. ¶ 6.)

{36}  The Fund Defendants allege a single claim for relief against WCM in the New York Action: conspiracy to commit racketeering activity, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d). (N.Y. Compl. ¶¶ 198–205.)

{37}  The remaining plaintiffs in the New York Action have also sued WCM for (1) fraud, (2) aiding and abetting fraud, (3) negligent misrepresentation, and (4) civil conspiracy. (N.Y. Compl. ¶¶ 206–36, 273–83.)

{38}  The Fund Defendants contend they have toed a fine line in the New York Action, in purported deference to Judge Ervin's preliminary injunction order.

{39}  Construing the preliminary injunction as only prohibiting them from pursuing state law tort claims against Plaintiffs in another jurisdiction, the Fund Defendants assert they have complied with that restriction in the New York Action by only alleging (as against WCM) a single count of conspiracy to violate the federal RICO statute.[10]

{40}  Defendants now move to stay this case in light of what they describe as "a single, more comprehensive action [in New York] asserting affirmative claims against [WCM] and other defendants arising out of the fraud perpetrated at Le-Nature's, Inc." (Defs.' Mot. Stay 1.)

{41}  Alternatively, Defendants move to dismiss the Complaint entirely, asserting that the Court lacks personal jurisdiction over them.

---

because of their relatively low credit quality." (N.Y. Compl. ¶ 60 (emphasis in original).)

[10] Defendants also spill much ink in their lengthy federal complaint attempting to convince the SDNY of the purported errors committed by Judge Ervin in his preliminary injunction order. Not only do these allegations ignore black-letter law as to the proper form of pleadings, *see*, *e.g.*, Fed. R. Civ. P. 8 (requiring only a "short and plain statement of the claim showing that the pleader is entitled to relief"), they are also entirely gratuitous as—unless this Court missed the memo announcing the demise of the Rooker-Feldman doctrine—the SDNY is in no position to review or opine upon the orders and judgments of Judge Ervin. *See D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 482 (1983) (stating that a federal district court has no authority to review state court judgments); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415–16 (1923) (holding that district courts do not have appellate jurisdiction over state courts).

{42}    Plaintiffs resist these motions and have moved that the Court find Defendants in civil contempt for lodging a federal RICO conspiracy claim against WCM in New York, asserting that the filing of the claim violates Judge Ervin's preliminary injunction order.[11]

II.

LEGAL PRINCIPLES

A.

MOTION TO STAY

{43}    This Court's authority to stay a pending action is found at section 1-75.12 of the North Carolina General Statutes, which states:

> If, in any action pending in any court of this State, the judge shall find that it would work substantial injustice for the action to be tried in a court of this State, the judge on motion of any party may enter an order to stay further proceedings in the action in this State. A moving party under this subsection must stipulate his consent to suit in another jurisdiction found by the judge to provide a convenient, reasonable and fair place of trial.

N.C. Gen. Stat. § 1-75.12 (2007).

{44}    The decision to grant or deny a stay "is a matter within the sound discretion of the trial judge and will not be disturbed on appeal absent an abuse of that discretion." *Lawyers Mut. Liab. Ins. Co. of N.C. v. Nexsen Pruet Jacobs & Pollard,* 112 N.C. App. 353, 356, 435 S.E.2d 571, 573 (1993) (citation omitted).

{45}    In determining whether to grant a stay under section 1-75.12 of the North Carolina General Statutes, the trial court may consider the following factors:

> (1) the nature of the case, (2) the convenience of the witnesses, (3) the availability of compulsory process to produce witnesses, (4) the relative ease of access to sources of proof, (5) the applicable law, (6) the burden of litigating matters not of local concern, (7) the desirability of litigating matters of local concern in local courts, (8) convenience and

---

[11] WCM advised the Court at the hearing of this matter that it has moved to dismiss the claims pending against it in New York. As of the entry of this Order, however, the Court is unaware of any action taken by the SDNY on WCM's motion.

access to another forum, (9) choice of forum by the plaintiff, and (10) all other practical considerations.

*Id.*

{46}   A trial court is not obligated to consider each enumerated factor, nor is it necessary that the court find that all factors positively support a stay.  *Id.* at 357, 435 S.E.2d at 574.

{47}   Instead, the court acts within its discretion as long as it considers whether "(1) a substantial injustice would result if the trial court denied the stay, (2) the stay is warranted by those factors present, and (3) the alternative forum is convenient, reasonable, and fair."  *Id.*

B.

DISSOLVING/MODIFYING A PRELIMINARY INJUNCTION

{48}   A preliminary injunction order is interlocutory in nature, *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 400, 302 S.E.2d 754, 759 (1983), and is a matter generally left to the sound discretion of the trial court.  *In re Albright*, 278 N.C. 664, 669, 180 S.E.2d 798, 802 (1971).

{49}   As such, one superior court judge may modify or dissolve a preliminary injunction order entered by another judge only upon a clear showing of changed conditions since the entry of the order.  *See Stone v. Martin*, 69 N.C. App. 650, 652, 318 S.E.2d 108, 110 (1984) (stating general rule as to modification of interlocutory orders by a different judge).  *But see Ruff v. Parex, Inc.*, 1999 NCBC 6 ¶ 38 (N.C. Super. Ct. June 17, 1999), http://www.ncbusinesscourt.net/opinions/1999%20NCBC %206.htm (suggesting that transfer of a case to the North Carolina Business Court for management through trial may by itself be sufficient grounds to allow modifications of orders entered by a predecessor judge).

{50}   "The burden of showing the change in circumstances is on the party seeking a modification or reversal of an order previously entered by another judge." *First Fin. Ins. Co. v. Commercial Coverage, Inc.,* 154 N.C. App. 504, 507, 572 S.E.2d 259, 262 (2002).

III.

ANALYSIS

{51}   The Court has carefully considered the factors deemed relevant by our appellate courts when ruling on a motion to stay.

{52}   In that regard, the Court is mindful that these factors are not intended to be a "rigid checklist in determining whether to grant a stay." *Lawyers Mut.,* 112 N.C. App. at 357, 435 S.E.2d at 574.

{53}   This case proves the wisdom of that admonition, as the record here is silent as to most of the factors. Nevertheless, what evidence is available on the question leads me to conclude that a stay is appropriate.

{54}   First, the Court acknowledges that Plaintiffs have strong ties to North Carolina. Wachovia is a national banking association, but it maintains its principal place of business in Charlotte, North Carolina. Similarly, while WCM is a Delaware limited liability company, it too maintains its principal place of business in Charlotte, North Carolina.

{55}   As for the nature of the case, the parties agree that Le Nature's perpetrated a massive fraud in obtaining financing for its operations, including the Credit Agreement at issue here. Where the parties diverge, however, is over who should bear responsibility for that fraud.

{56}   Plaintiffs allege that the Fund Defendants, all of whom are foreign entities with (it appears) sporadic connections to this state, acquired interests in the Credit Facility for the express purpose of laying the blame for Le-Nature's fraud at Plaintiffs' door.

{57}   According to Plaintiffs, however, they too were victimized by Le Nature's when they extended over $17 million in credit to the Company in reliance on "audited financial statements and other information indicating that Le-Nature's was a growing, vibrant, and profitable company." (Compl. ¶ 1.)

{58} Not surprisingly, Defendants have a different view of the Le Nature's debacle. They allege that WCM actively concealed Le Nature's fraud because, among other things, it "knew that, had the real situation at Le Nature's been revealed, it would have been unable to syndicate the [Credit Facility]" and thus, would have been unable to foist off its exposure for the debt to the unsuspecting syndicate lenders. (N.Y. Compl. ¶ 7.)

{59} Plaintiffs filed this lawsuit to preempt Defendants' threats to sue them in tort for the financial losses caused by Le-Nature's demise. In their Complaint, Plaintiffs insist that, "Defendants' assertion of such purportedly assigned causes of action amounts to illegal trafficking in litigation claims and is flatly prohibited by North Carolina law." (Compl. ¶ 2.)

{60} Defendants respond that New York law governs the scope of their rights in the Le-Nature's debt acquired in the secondary loan market. (Defs.' Br. Supp. Mot. Stay 5–6.)

{61} On these facts, and nothing else appearing, North Carolina generally would have a strong interest in resolving a dispute involving businesses with a substantial presence in this State.

{62} This is particularly so where Plaintiffs have chosen their home forum to litigate. *See Wachovia Bank, N.A. v. Deutsche Bank Trust Co. Americas,* 2006 NCBC 8 ¶ 51 (N.C. Super. Ct. June 2, 2006), http://www.ncbusinesscourt.net /opinions/2006%20NCBC%208.htm (stating that courts generally give great deference to a plaintiff's choice of forum, particularly where the plaintiff selected its home forum to bring suit).

{63} But the posture of this case, when viewed in the context of the broader litigation pending in New York, leads me to conclude that a stay is appropriate.

{64} Plaintiffs' primary claim is that the Fund Defendants have no right under North Carolina law to sue them in tort for claims purportedly acquired in the secondary loan market. According to Plaintiffs, they felt compelled to sue after the Fund Defendants threatened publicly to sue them for the losses caused by Le-Nature's fraud.

{65}  In short, rather than call the Fund Defendants' bluff, Plaintiffs filed what is primarily a preemptive declaratory judgment action in North Carolina, thus guaranteeing the very fight they profess to have wanted to avoid, but in a forum more to their liking.

{66}  Against this backdrop, Plaintiffs' choice of forum is not entitled to substantial weight. *See Coca-Cola Bottling Co. Consol. v. Durham Coca-Cola Bottling Co.,* 141 N.C. App. 569, 579, 541 S.E.2d 157, 164 (2000) ("[I]n situations in which two suits involving overlapping issues are pending in separate jurisdictions, priority should not necessarily be given to a declaratory suit simply because it was filed earlier.  Rather, if the plaintiff in the declaratory suit was on notice at the time of filing that the defendant was planning to file suit, a court should look beyond the filing dates to determine whether the declaratory suit is merely a strategic maneuver to achieve a preferable forum.").

{67}  Second, Plaintiffs' claims in this Court are predominately questions of law. More particularly, whether the Fund Defendants will be allowed to assert tort claims against Plaintiffs that they acquired via assignment of a portion of the Credit Facility will be for a judge to decide.  *See Stetser v. TAP Pharm. Prods. Inc.,* 165 N.C. App. 1, 14, 598 S.E.2d 570, 579 (2004) (holding that a trial court's application of conflict of law rules is a legal conclusion).

{68}  Consequently, that WCM may now have to litigate that issue as a Defendant in the New York Action, rather than as a Plaintiff in North Carolina, does not, in the Court's view, amount to material prejudice.

{69}  Third, the Court's analysis cannot ignore a comparison of the cast of characters and claims in the two actions.  As Defendants note in their papers, this Court has before it only a subset of the issues pending in New York.  In contrast, the New York Action involves the seven remaining Fund Defendants, thirteen additional parties not before this Court, and nine affirmative claims not yet asserted in North Carolina.

{70}  And while it is true that Wachovia is not a named defendant in the New York Action, "[t]o grant a stay, it is not required that the parties and issues in both

actions be identical. Substantial or functional identity is sufficient."[12] *AT&T Corp. v. Prime Sec. Distribs., Inc.,* No. 15177, 1996 Del. Ch. LEXIS 134, at * 6 (Del. Ch. Oct. 24, 1996).

{71} Here, although Wachovia is not a party to the New York Action, its affiliate WCM certainly is. For that reason, I have little doubt that Wachovia's interests will be adequately protected in New York, and that the New York Action will fully and finally resolve this dispute.

{72} Additionally, the core premise of Plaintiffs' Complaint is that Defendants have no right to sue them for Le-Nature's financial implosion. For whatever reason, Defendants have heeded that message in New York as to Wachovia. Thus, Wachovia's cry of foul because Defendants have not done what Wachovia insists they have no right to do is not particularly compelling. The more relevant difference between the New York Action and this one is that the former is far broader in scope, both as to parties and claims.

{73} With respect to the other factors deemed relevant to the question before me, although neither side presents any evidence on the point, the Court may safely assume that at least some of the relevant witnesses are current or former employees of the parties, who presumably are under the parties' control and thus would appear for trial in North Carolina or New York.

{74} On the other hand, to the extent testimony is required from present or former Le Nature's employees, such witnesses would not be within the control of the parties and, unless otherwise subject to the court's jurisdiction, could not be compelled to testify in either state.

{75} The parties' briefs are also replete with argument, but little evidence, as to the relative ease of access to sources of proof.

---

[12] None of the Agent Defendants is a party in the New York Action. This omission, however, is of no great consequence, given that the Agent Defendants hold no direct interests in the Credit Facility and therefore have no claims to pursue against Plaintiffs arising from that transaction. In any event, despite the lack of perfect symmetry as to parties, the Court is satisfied that the competing actions are at least substantially identical.

{76}   Just as with witness testimony, however, at least some of the relevant documents are likely within the control of the parties, and thus would be readily accessible to all parties, regardless of where the issues are tried.  As for documents within Le-Nature's control (or that of other third-parties), neither this Court nor the SDNY hold any particular advantage, as both have procedures available to compel production of evidence by third-parties.  Accordingly, the locations of sources of proof do not clearly point to one jurisdiction as more or less convenient, particularly since it appears the parties have substantial financial resources to expend on litigation.

{77}   Relying on *Green v. Wilson,* 163 N.C. App. 186, 592 S.E.2d 579 (2004), Plaintiffs contend that a stay would be improper "because this Court has already asserted jurisdiction over the tort claims against Wachovia that the defendants have attempted to trade by assignments."  (Pls.' Br. Opp'n Mot. Stay 10.)

{78}   *Green,* however, involved a dispute over title to real property located in North Carolina.  The precise question in that case was whether the trial court could properly consider a motion to stay in favor of an action pending in Georgia, where North Carolina had exclusive *in rem* jurisdiction over the real property.  *Green,* 163 N.C. App. at 188, 592 S.E.2d at 581.

{79}   The Court of Appeals held that a stay was never appropriate in such circumstances, because "[w]hen title to property is determined, only the court with *in rem* jurisdiction may serve as a proper forum."  *Id.* at 190–91, 592 S.E.2d at 582.

{80}   Plaintiffs' attempt to apply the *Green* holding to the facts before me, however, is the legal equivalent of attempting to fit a square peg into a round hole.

{81}   In the first place, unlike the plaintiffs in *Green,* Plaintiffs here do not contend they own the assigned tort claims; "[r]ather, they are . . . attempting to prevent Defendants from pursuing these claims."  (Defs.' Br. Opp'n. Pls. Mot. Contempt. 10.)

{82}   Second, in issuing his preliminary injunction order, Judge Ervin did not assert jurisdiction over a *res* (at least not in the sense that a court asserts exclusive authority over property within its territorial jurisdiction), but instead acted only to

temporarily enjoin the Fund Defendants from pursuing their tort claims against Plaintiffs (except in this Court) to prevent a multiplicity of suits related to the assigned claims. (Prelim. Inj. Order ¶¶ 17–18.)

{83} Third, unlike the real property dispute in *Green,* Plaintiffs cannot credibly argue that this Court has exclusive jurisdiction over the claims or the parties before it.

{84} Accordingly, *Green* is of little utility here.

{85} Plaintiffs also argue that Defendants' Motion to Stay "rests on the false assumption all of the disputes between the parties here can be and will be adjudicated in New York." (Pls.' Br. Opp'n Mot. Stay 2.) This is because, according to Plaintiffs, none of their affirmative claims in this case are compulsory counterclaims in the New York Action. (Pls.' Br. Opp'n Mot. Stay 2.)

{86} But that argument proves too much, as the fact that Plaintiffs may not be compelled to bring their claims in New York does not mean they are **barred** from doing so.[13] *See* Fed. R. Civ. P. 13(a)(2)(A) (stating only that a pleader need not state an otherwise compulsory counterclaim "if [at the time] the [federal court] action was commenced, the claim was the subject of another pending action").

{87} In the end, whatever I do in North Carolina, the New York Action will proceed. Accordingly, I find no good reason for expending precious judicial resources by insisting on the presentation of overlapping (if not identical) testimony and evidence in two jurisdictions. As our Court of Appeals has aptly noted:

> The declaratory remedy should not be invoked to try a controversy by piecemeal, or to try particular issues without settling the entire

---

[13] Wachovia's separate claim for indemnification may not be asserted as a counterclaim in the New York Action because Wachovia is not (at present) a party there. But although Wachovia asserts that the Credit Facility lenders owe it over $1 million in indemnification (Compl. ¶ 76), its claim in the North Carolina action lies only against three Defendants, for a total sum of $58,973.12. (14 Mar. 2007 Harkness Aff. Ex. I.) In contrast, the New York Action alleges that the potential losses attributable to the Credit Facility are north of $165 million. (N.Y. Compl. ¶ 4.) Clearly then, the primary dispute between the parties centers, not on Wachovia's right to indemnity, but instead on the Fund Defendants' purported right to pursue their multi-million tort claims. There is little doubt that this latter issue can and will be addressed in New York. Additionally, should Wachovia prefer to resolve its indemnity claim in a single action, nothing prevents it from assigning the claim to its affiliate WCM, who could then pursue it as a counterclaim in New York.

> controversy. This is especially so where a separate suit has been filed, or is likely to be filed, that will more fully encompass the scope of the entire controversy.

*Coca-Cola Bottling Co.,* 141 N.C. App. at 578, 541 S.E.2d at 163 (internal citation and quotation marks omitted).

{88} Finally, the Court acknowledges the parties' wildly divergent views as to the choice of law applicable to the assignments at issue here. Not surprisingly, both sides insist that the answer to this question is as plain as the nose on my face.

{89} This Court, however, has learned through experience that "to spell out the obvious is often to call it in question."[14] On this sparse record, and without the benefit of fully developed arguments by the parties, I cannot say whether North Carolina or New York law applies to this dispute.

{90} Plaintiffs contend North Carolina law applies to the assignments because that was the choice of law agreed to by the Fund Defendants under the Credit Facility.

{91} In that regard, the Court notes that the Supplements (which Plaintiffs rely on as their "hook" for the application of North Carolina law), are somewhat ambiguous on the point because, although they purport to limit assignments to the reach of applicable law, they also state that the interests being assigned include "contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned." (14 Mar. 2007 Harkness Aff. Ex. C.)

{92} Alternatively, Plaintiffs contend this Court cannot honor the purported choice of New York law in the Standard Terms because "[a] North Carolina court will never apply foreign law if that law offends a fundamental public policy of this State—and application of foreign champerty law in this action would run afoul of this basic principle." (Pls.' Br. Opp'n Mot. Stay 15.)

---

[14] Eric Hoffer, *The Passionate State of Mind, and other Aphorisms* 122 (1955).

{93}    This statement, however, goes too far.  Our Supreme Court has indeed held that "foreign law or rights based thereon will not be given effect or enforced if opposed to the settled public policy of the forum."  *Boudreau v. Baughman,* 322 N.C. 331, 342, 368 S.E.2d 849, 857 (1988) (citation omitted).

{94}    But subsequent cases applying this doctrine to contractual choice of law clauses have cited with approval the Restatement (Second) of Conflict of Laws § 187 (1971), which provides in pertinent part:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied, . . . unless either
>
> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Cable Tel Servs., Inc. v. Overland Contracting, Inc.,* 154 N.C. App. 639, 642–43, 574 S.E.2d 31, 33–34 (2002) (citing Restatement (Second) of Conflict of Laws § 187 (1971)).

{95}    Thus, before this Court even considers the public policy implications of applying New York law to this dispute, it would first need to determine whether North Carolina law would apply to the assignments had the Fund Defendants not chosen otherwise in the Standard Terms.

{96}    As to that question, "North Carolina has long adhered to the general rule that 'lex loci contractus,' the law of the place where the contract is executed governs the validity of the contract."  *Citibank, S.D., N.A. v. Palma,* 646 S.E.2d 635, 638 (N.C. Ct. App. 2007) (citation omitted).

{97}    Given the number of assignments executed in this case, however, and the limited record before me, I cannot say with any confidence what the answer to that question is.

{98}  In *Boudreau*, our Supreme Court also held that North Carolina's public policy exception to the comity generally afforded the laws of our sister states is a narrow one.  Thus,

> the mere fact that the law of the forum differs from that of the other jurisdiction does not mean that the foreign statute is contrary to the public policy of the forum.  To render foreign law unenforceable as contrary to public policy, it must violate some prevalent conception of good morals or fundamental principle of natural justice or involve injustice to the people of the forum state.

*Boudreau*, 322 N.C. at 342, 368 S.E.2d at 857–58 (citations omitted).

{99}  No less relevant here is the basis for such a rule in the first place.  The notion that North Carolina courts should not sacrifice important public policy norms at the altar of a sister state's jurisprudence makes perfect sense when a party deliberately seeks to enforce its rights in this state.  As our Supreme Court has explained:

> To justify a court in *refusing to enforce a right of action which accrued under the law of another state*, because against the policy of our laws, it must appear that it is against good morals or natural justice, or that for some other such reason the enforcement of it would be prejudicial to the general interests of our own citizens. . . . The general rule is that when an action is transitory, and the right has become fixed and liability has been incurred in the state where the transaction occurred[,] *such right of action may be pursued and such liability enforced* in any court which has jurisdiction of such matters and can secure jurisdiction of the parties, provided that the statute under which the cause of action arose is not inconsistent with the public policy of the state in which the cause of action is sought to be enforced.

*Rodwell v. Camel City Coach Co.,* 205 N.C. 292, 295–96, 171 S.E. 100, 102 (1933) (emphasis added, internal citations and quotation marks omitted).

{100} This case, however, is altogether different.

{101} Here, it is Plaintiffs who—by virtue of having been the first to file in this state—seek to invoke North Carolina's public policy prohibiting champerty and maintenance as a *defensive* measure to enjoin the Fund Defendants (none of whom

have ever sought to enforce their rights under the Credit Facility in North Carolina) from pursuing litigation against them.

{102} As a result, this Court is not convinced that this state's public policy would ineluctably require the application of North Carolina law to the principal dispute between the parties. In any event, if North Carolina law does apply, that decision should be the result of an informed analysis of substantive choice of law rules, not an arbitrary race to a particular courthouse.

{103} In the New York Action (where Defendants do seek to enforce their rights under the Credit Facility), the SDNY would apply New York's traditional choice of law rules to resolve the question. *See, e.g., Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989) (stating that a federal court adjudicating a supplemental state law claim must apply the choice of law rules of the forum state).

{104} With respect to Defendants' contention that the Standard Terms require application of New York law, it is true that New York courts generally honor a contractual choice of law clause, so long as "the jurisdiction chosen by the parties has a substantial relationship to the parties or their performance." *Woodling v. Garrett Corp.,* 813 F.2d 543, 551 (2d Cir. 1987).

{105} Nevertheless, "[u]nder New York law . . . tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract." *Dessert Beauty, Inc. v. Platinum Funding Corp.*, 519 F. Supp. 2d 410, 419 (S.D.N.Y. 2007) (quoting *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.,* 414 F.3d 325, 335 (2d Cir. 2005)). As a result, the Standard Terms do not dispose of the choice of law issue in this case.

{106} Instead, it appears that "New York courts confronted with a choice of law issue in torts (including the validity of a purported assignment of tort claims) conduct an 'interest analysis,' assessing which of the competing jurisdictions has the greatest interest in seeing its law applied to the matter at issue." *Stichting Ter*

*Behartiging Van De Belangen Van Oudaandeelhouders in Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber,* 407 F.3d 34, 50 (2d Cir. 2005) (citation omitted).[15]

{107} In *Stichting,* the question before the court was whether New Jersey or New York law applied to the plaintiff's assignment of a legal malpractice claim. *Id.* at 58.

{108} As appears to be the case before me, the question in *Stichting* was dispositive because New Jersey law prohibits such assignments, while New York law authorizes them. *Id.* at 47.

{109} Following a thorough exposition of the relevant legal principles, the court in *Stichting* concluded that New York choice of law principles provided no clear answer, given that the "interests of the competing jurisdictions suggest[ed] conflicting results." *Id.* at 53. The court therefore certified the question to the New York Court of Appeals, but before that court could opine on the matter, the parties settled their dispute. *Stichting Ter Behartiging Van De Belangen Van Oudaandeelhouders in Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 421 F.3d 124, 125 (2d Cir. 2005).

{110} Admittedly, *Stichting* raises more questions than it answers. At a minimum, however, *Stichting* shows that even if (as Defendants insist), the assignments in this case are valid as a matter of New York law, that result does not foreclose the application of North Carolina law to any tort claims Defendants may attempt to pursue against WCM in the New York Action.

{111} The point of this brief foray into the choice of law thicket is to show that the answer is not a "slam-dunk" for either side. This much, however, is clear: the

---

[15] I note that, "[i]n actions arising in tort, North Carolina applies the doctrine of "lex loci deliciti" meaning that "the law of the state where the tort was allegedly committed controls the substantive issues of the case." *Gbye v. Gbye*, 130 N.C. App. 585, 585, 503 S.E.2d 434, 434 (1998). At least one North Carolina federal court has suggested that North Carolina state courts would apply the "most significant relationship test" to claims involving multi-state misrepresentations. *See Jordan v. Shaw Indus.*, No. 6:93CV542, 1996 U.S. Dist. LEXIS 17917, at *16–17 (M.D.N.C. August 13, 1996) (citing *Michael v. Greene*, 63 N.C. App. 713, 306 S.E.2d 144 (1983)). *Greene*, however, addressed a choice of law issue arising in the context of an unfair and deceptive trade practices act claim. My research has disclosed no case where our appellate courts have applied this latter test to common law misrepresentation claims.

SDNY is a court that routinely addresses complex business disputes and thus, is as capable as any of sorting out the choice of law question in this case.

{112} I find that the SDNY is a fair and convenient forum for the litigation of the claims before me. I also reject the notion that granting Defendants' Motion to Stay "simply shift[s] the inconvenience from one party to another." *Sara Lee Corp. v. Gregg*, No: 1:02CV00195, 2002 U.S. Dist. LEXIS 26985, at *15 (M.D.N.C. July 31, 2002) (citation omitted).

{113} Instead, my decision merely recognizes the practical reality that the New York Action is better able to arrive at a more comprehensive resolution of the litigation, given the broader scope of claims and parties before it. As a result, while this Court is certainly capable of handling this case, judicial economy counsels against my proceeding further.

{114} In sum, I have determined that (1) a stay is warranted by those factors present on the record before me, (2) the SDNY is a convenient, reasonable, fair, and more comprehensive forum for the resolution of this litigation, and (3) it would work a substantial injustice for this action to be tried in North Carolina.

{115} In light of these findings, the Court modifies Judge Ervin's preliminary injunction order as specified below.

IV.

CONCLUSION

{116} The Court **GRANTS** Defendants' Motion to Stay, subject to the Court's authority pursuant to section 1-75.12(b) of the North Carolina General Statutes to modify the stay order and take such other action as the interests of justice require. For example, should WCM prevail on its motion to dismiss in the New York Action, the Court would obviously revisit its stay order.

{117} The preliminary injunction entered by Judge Ervin is modified so as to allow the Fund Defendants to attempt to assert in the New York Action all claims arising from their acquisition of interests in the Credit Facility.

{118} To resolve the judicial "Whac-a-Mole" dilemma posited by Plaintiffs at oral argument and in their papers,[16] that portion of Judge Ervin's preliminary injunction order barring Defendants from further assignment of Personal Tort Claims to entities not a party to this litigation, except on the express terms set forth in his order, shall remain in full force and effect.

{119} The Court defers action at this time on the Motion for Contempt and the Motion to Dismiss, but this decision should not be construed by Defendants as an adjudication of the merits of either motion, which the Court reserves for a later date.

**SO ORDERED** this the 13th day of March, 2008.

---

[16] For readers without young children, "Whac-a-Mole" is an arcade game involving mechanical moles that pop up from their holes at random. "The object of the game is to force the individual moles back into their holes by hitting them directly on the head with the mallet, thereby adding to the player's score. If the player does not strike a mole within a certain time or with enough force, it will eventually sink back into its hole with no score." Wikapedia, http://en.wikipedia.org/wiki/Whac-A-Mole (last visited March 6, 2008). Plaintiffs contend the Court's preliminary injunction order serves the purpose of preventing Defendants from playing "Whac-a-Mole" with the tort claims by "simply assign[ing] their claims to other entities—effectively sending Wachovia on a completely futile and endless wild goose chase in search of the correct defendant to sue." (Pls.' Br. Opp'n Mot. Stay 7.) The Court confesses to be a "Whac-a-Mole" aficionado, but it will enjoin any such amusement in this case so as to allow a full and expeditious resolution of the claims in New York.